1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

THOMAS WEATHERS, et al.,

                Defendants.

CASE NO. C18-5189 BHS

ORDER DENYING PRECISION
PROPERTY MANAGEMNT
CORPORATION'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

13

14

15

16

      This matter comes before the Court on Defendant Precision Property Management Corporation's ("Precision") motion for partial summary judgment. Dkt. 114. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby denies the motion for the reasons stated herein.

17

## I.   PROCEDURAL HISTORY

18

19

20

21

22

      On March 12, 2018, the Government filed this action against numerous defendants, including Precision, seeking to reduce federal tax liens against Defendants Thomas and Kathy Weathers ("Weathers"), TKW Limited Partnership, and T&K Weathers Limited Partnership ("T&K"). Dkt. 1. The Government named Precision as a defendant because it has stated an interest in one of the subject properties the

Government seeks to sell for proceeds. *Id.* The Government seeks to impose a lien on the real property located at 605 Academy Street, Kelso, WA 98626 ("605 Academy"), which is currently held by Precision. *Id.* at 49–51. The Government alleges that Precision is a nominee or alter ego of the Weathers or, in the alternative, the Weathers fraudulently transferred 605 Academy to Precision. *Id.*

On June 5, 2020, Precision moved for partial summary judgment. Dkt. 114. On July 6, 2020, the Government responded. Dkt. 119. On July 17, 2020, Precision replied. Dkt. 112.

## II.   FACTUAL BACKGROUND

1.   <u>Precision Property Management Corporation</u>

On June 28, 2005, Tom and Kathy Weathers were convicted of tax evasion for 1996 and of failing to file income tax returns from 1998 through 2002. 911 Management ("911") was established shortly thereafter to manage the Weathers' property, and the Weathers entered into written lease agreements with 911 to operate the Weathers' Oregon hotel properties. *911 Mgmt., LLC v. United States*, 657 F. Supp. 1186, 1195 (D. Or. 2009). In early 2009, 911 began to wind down its business and was terminating its hotel lease at one of the Weathers' hotel properties, the Joyce Hotel. Dkt. 115 ⁋ 2.

Precision asserts that, as 911 was terminating its lease at the Joyce Hotel, the Weathers' oldest son, Brian Weathers ("Brian"), saw a business opportunity. Dkt. 115. ⁋ 3. Brian declares that he, Rockwell Naron ("Naron"), and Daniel Dent ("Dent")—all former 911 employees—formed Precision in March 2009. *Id.* The Government, on the other hand, argues that Precision was formed in part because 911 had dissolved after a

court found it to be a nominee of the Weathers. Dkt. 119-8 at 8; Dkt. 119-6 at 5. After its formation, Precision negotiated a lease with the Joyce Hotel and contracted with T&K to manage T&K's Washington rental properties.

In early 2013, BKKB, Inc. purchased Precision. BKKB is a Washington corporation formed by the Weathers' four children and holds a 70% interest in T&K. Dkt. 119-6 at 11. In its purchase of Precision, BKKB was to pay Dent $25,000 for his stake in Precision, Brian $100 for his stake, and Naron $75 for his stake. *Id.* at 15–17. The Government asserts that Dent was only paid $100 for his share in Precision and that he never received the remaining $24,900 of his purchase. *Id.* at 17–18. In his deposition, Brian stated that Dent waived the remaining payment out of Dent's ties to the Weathers family. *Id.* BKKB paid $275 in total to purchase Precision.

Tom Weathers ("Tom") began to work as an employee and subcontractor for Precision in approximately late 2009. Dkt. 119-3 at 15. In 2018, Precision paid Tom $26,000 in employee wages. Dkt. 119-1 at 104. Precision argues that Tom worked as a subcontractor for Precision because it was less expensive to hire Tom to maintain the electronic systems than hire the work out to others. Dkt. 115 ¶ 7. Precision also admits that it occasionally paid the Weathers' rent or a portion of it in exchange for office and storage space in the Weathers' home. *Id.* at ¶ 8. The Government states that, as part of his duties, Tom manages Precision's bills, which are sent directly to his personal residence. Dkt. 119-1 at 164–71.

The Government also asserts that Precision has been making monthly payments to Tom of approximately $1,000 to $2,600. Precision argues that these payments are in

1   connection with a guarantee for Precision's lease of the Joyce Hotel. Dkt. 119-6 at 20–23.

2   The Government contends that these payments via check always refer to a "cosigner fee,"

3   "cosignatory fee," or "management fee" and were not for Tom's guarantee of the Joyce

4   Hotel lease. Dkt. 119-2 at 42–43.[1] On at least two occasions, these checks were written

5   out to Kathy Weathers. *Id.* The Government presents two theories as to these payments,

6   contrary to Precision's assertion that the payments were related to a guarantee fee. First,

7   it presents Tom's deposition testimony, stating that Precision paid Tom a flat fee for

8   additional work that he does to maintain Precision's computer system. Dkt. 119-3 at 17–

9   18. Second, it presents the deposition of Precision's current president, David Tacke, who

10  stated that the payments were an effort, at least in part, to have Tom "go away" from the

11  operation of the Joyce Hotel. Dkt. 119-5 at 13. In sum, the Government puts forth that the

12  Weathers received at least $241,165 from Precision between 2014 and 2019. Precision

13  does not refute this fact.

14          2.      The Property: 605 Academy Street

15          Jason ("Schoonover") and Heather Schoonover are the immediate preceding

16  owners of 605 Academy Street. Precision owns the neighboring property, 603 Academy

17  Street, and contends that its owners resolved to purchase 605 Academy and authorized

18  Naron to sign all documents related to the purchase on August 7, 2010. Dkt. 115 ¶ 10. On

19  August 12, 2010, the owners of Precision—Brian, Dent, and Naron—again met and

20  confirmed by corporate resolution their agreement to purchase 605 Academy for a price

21

22          [1] The Court accepts the summary exhibit pursuant to Fed. R. Evid. 1006. Production of the
    underlying checks is not necessary at this stage.

ORDER - 4

1  to be negotiated by Brian and Naron. *Id.* Precision asserts that Tom Weathers was not

2  involved in the initial stages of Precision's purchase of 605 Academy. The Government

3  paints another picture. It submits that Tom testified that Schoonover contacted him first

4  to ask if Tom would buy 605 Academy and that Tom demurred because he did not have

5  the money or time for the property. Dkt. 119-3 at 25. The Government also submits

6  Schoonover's declaration, which states that Tom first approached Schoonover about

7  purchasing 605 Academy. Dkt. 120 ¶ 3.[2]

8      On August 6, 2010, Schoonover signed a purchase and sale agreement for 605

9  Academy; Tom signed the same on August 18, 2010. *Id.* ¶ 4. Precision states that Tom

10  signed the purchase and sale agreement "[f]or reasons that are unclear," Dkt. 114 at 5,

11  and Tom stated in his deposition that he did not recall ever seeing the sale agreement,

12  though he acknowledge that his signature appeared on the document, Dkt. 119-3 at 26–

13  27. The Government contends that Tom was active in the purchase of 605 Academy. It

14  states that the title company facilitating the sale, Cowlitz County Title, received a

15  commitment for title insurance for a policy in Tom's name. Dkt. 121 ¶ 7; Dkt. 121-1 at

16

17

18      [2] Precision objects to the Government's reliance on Schoonover's declaration in its response. "A
party may object that the material cited to support or dispute a fact cannot be presented in a form that
would be admissible in evidence." Fed. R. Civ. Pro. 56(c)(2). And a declaration used to oppose a motion

19  "must be made on personal knowledge" and "set out facts that would be admissible in evidence." *Id.* at
(c)(4). Precision objects to Paragraph 3 of Schoonover's declaration, arguing that it lacks personal
knowledge. The use of the phrases "I understood" or "it was my understanding" do not *per se* indicate

20  that the declarant lacks personal knowledge. Personal knowledge may include inferences and opinions,
but "those inferences must be substantiated by specific facts." *Davis v. Cty. of Chicago*, 841 F.2d 186,
189 (7th Cir. 1988). Schoonover's understanding was based on a conversation he had with Tom

21  Weathers. *See* Dkt. 120 ¶ 3. The remainder of Precision's objections are rendered moot as the Court does
not rely on the remaining objected portions of the declarations to reach its decision.

22

1    15–21. Schedule C of the policy included several exceptions to the federal tax liens

2    against Tom. Dkt. 121-1 at 18–19.

3        On August 29, 2010, Tom and Naron assigned their rights to purchase the property

4    to Precision. Precision argues that Tom never paid any money relating to the purchase or

5    later expenses of 605 Academy. On October 19, 2010, Precision signed a promissory note

6    in favor of Jason and Heather Schoonover for the full amount of the $80,000 purchase

7    price. Dkt. 116-5. A second commitment of title insurance with Precision as the proposed

8    insured was submitted to Cowlitz County Title; this version did not include the federal

9    tax liens against Tom. Dkt. 121-1 at 29–37. On October 21, 2010, a copy of the Warranty

10   Deed naming Precision as the buyer was recorded with the Cowlitz County Auditor. Dkt.

11   116-8.

12       Precision submits that the extent of Tom's involvement in the purchase of 605

13   Academy was his signature on the purchase and sale agreement for eleven days. The

14   Government, on the other hand, argues that Tom played an active role in the purchase of

15   605 Academy.

16                              **III.  DISCUSSION**

17       Precision moves for summary judgment on the issues of whether it is the

18   Weathers' nominee or alter ego or, in the alternative, whether the Weathers fraudulently

19   transferred property they owned to Precision. Dkt. 114.

20   **A.    Summary Judgment Standard**

21       Summary judgment is proper only if the pleadings, the discovery and disclosure

22   materials on file, and any affidavits show that there is no genuine issue as to any material

ORDER - 6

1    fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a),

2    (c). The moving party is entitled to judgment as a matter of law when the nonmoving

3    party fails to make a sufficient showing on an essential element of a claim in the case on

4    which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S.

5    317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a

6    whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita*

7    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

8    present specific, significant probative evidence, not simply "some metaphysical doubt").

9    Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

10   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

11   versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

12   *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

13          The determination of the existence of a material fact is often a close question. The

14   Court must consider the substantive evidentiary burden that the nonmoving party must

15   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

16   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

17   issues of controversy in favor of the nonmoving party only when the facts specifically

18   attested by that party contradict facts specifically attested by the moving party. The

19   nonmoving party may not merely state that it will discredit the moving party's evidence

20   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

21   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

22

1   nonspecific statements in affidavits are not sufficient, and missing facts will not be

2   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

3   **B.    Nominee or Alter-Ego**

4        The IRS has broad powers to impose federal tax liens under 26 U.S.C. § 6321,

5   which provides that a lien may be imposed "upon all property and rights to property"

6   belonging to a taxpayer who has failed to pay taxes owed after assessment and demand.

7   *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013). Section 6321

8   applies to all property of a taxpayer, including property that is held by a third party as the

9   taxpayer's nominee or alter ego. *Id.*; *see also G.M. Leasing Corp. v. United States*, 429

10  U.S. 338, 350–51 (1977). State law controls in determining whether an entity is a

11  nominee or alter ego of the taxpayer. *United States v. Nat'l Bank of Commerce*, 472 U.S.

12  723, 722 (1985).

13        Washington state courts recognize the alter ego doctrine. *See Rapid Settlements,*

14  *Ltd. v. Symetra Life Ins. Co.*, 166 Wn. App. 683, 692 (2012); *Standard Fire Ins. Co. v.*

15  *Blakeslee*, 54 Wn. App. 1, 5 (1989). And federal courts in Washington recognize both

16  nominee and alter ego doctrines. *See Sharp Mgmt. LLC v. United States*, No. C07-402-

17  JLR, 2007 WL 1367698, at *3, *3 n.3 (W.D. Wash. 2007) (indicating that no Washington

18  state court has addressed nominee liability, but finding that the theory still applies in

19  Washington as the alter ego doctrine is a "close kin of the nominee theory"); *accord*

20  *United States v. Smith*, No. C11-5101 RJB, 2012 WL 1977964, at *5 (W.D. Wash. 2012);

21  *United States v. Black*, 725 F. Supp. 2d 1279, 1291–92 (E.D. Wash. 2010), *aff'd* 482 Fed.

22  Appx. 241 (9th Cir. 2012). To determine whether one party holds property as the

1    nominee of another, federal courts in Washington apply the Ninth Circuit's six-factor

2    test: (1) whether the nominee paid no consideration or inadequate consideration; (2)

3    whether the property was placed in the name of the nominee in anticipation of a suit or

4    occurrence of liabilities; (3) whether there is a close relationship between the transferor

5    and the nominee; (4) whether the parties failed to record the conveyance; (5) whether the

6    transferor retained possession; and (6) whether the transferor continues enjoyment of the

7    benefits of the property. *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir.

8    1993).

9         Under the Washington alter ego doctrine, a corporate entity is disregarded when

10   the corporation has been intentionally used to violate or evade a duty owed to another.

11   *Black*, 725 F. Supp. 2d at 1290 (citing *Morgan v. Burks*, 93 Wn.2d 580, 585 (1980)). An

12   alter ego is found where one person "so dominates and controls a corporation," and

13   therefore "a court is justified in piercing the veil of corporate entity and holding that the

14   corporation and private person are one and the same." *Rapid Settlements, Ltd.*, 166 Wn.

15   App. at 692 (internal citation omitted). It appears to the Court that Washington state

16   courts have not addressed the alter ego theory in terms of tax and tax liens. One federal

17   court applying the Washington state alter ego theory to a federal tax case held that the

18   doctrine is applicable where the party was using an artificial legal entity to insulate

19   themselves from their tax liabilities. *Black*, 725 F. Supp. 2d at 1279. In cases where state

20   law is not clear as to the applicability of the alter ego doctrine to tax law, courts in the

21   Ninth Circuit have applied the *Towe Antique Ford Foundation* nominee factors. *See, e.g.*,

22   *911 Mgmt.*, 957 F. Supp. 2d at 1194.

1   Under either theory in this case, Precision has failed to meet its burden to establish

2   an absence of disputed material facts. No single factor is dispositive to determine

3   nominee or alter ego status, *Fourth Inv. LP*, 720 F.3d at 1070, and several of the factors

4   are highly disputed between the parties. For example, the parties dispute whether Tom

5   assigned the purchase of 605 Academy to Precision in anticipation of litigation or

6   liabilities. This nominee factor is the core of alter ego status as it addresses whether Tom

7   used Precision to insulate himself from his tax liabilities. In their depositions, Brian,

8   Naron, and Tom all testified that Tom did not have any role in the purchase of 605

9   Academy. Precision therefore argues that the Weathers never had the legal capacity to

10  transfer 605 Academy. The Government, on the other hand, argues that Tom signed the

11  original purchase agreement in his personal, individual capacity and that the initial

12  commitment for title insurance was solely in Tom's name. The initial commitment listed

13  several exceptions for the various tax liens against the Weathers. According to the

14  Government, Tom assigned his interest in the agreement so that the title would free of the

15  exceptions, and that is what has occurred when Precision took title. The Government puts

16  forth a theory that Tom assigned the agreement to Precision to keep it away from his

17  creditors and to insulate himself from liability. Precision directly refutes this theory

18  stating that it acted independently in the purchase of 605 Academy.

19  Moreover, the Government argues that Precision's payments to Tom, and

20  occasionally Kathy, starting in 2010 indicates that the Weathers financially benefitted

21  from the rental income of 605 Academy. The Government asserts that Tom assigned his

22  interest in 605 Academy so that Precision would generate rental income for the

1  Weathers' benefit free and clear of any tax liens. Precision denies this theory, arguing

2  that every payment from Precision to Tom was predicated on a corresponding financial

3  benefit to Precision. According to Precision, Tom never a held a position to direct or

4  control the company, which is dispositive to whether Precision is a nominee or alter ego

5  of the Weathers. However, the Government argues the lack of possession merely shows

6  how Tom's actions have become more sophisticated in avoiding tax liabilities. These

7  disputes between the parties create triable issues of fact.

8       In sum, Precision argues that the Weathers had no involvement with the purchase

9  of 605 Academy and that Precision is an independent corporation wholly apart from the

10  Weathers. However, "the nominee theory focuses on the relationship between the

11  taxpayer and the property." *Sharp Mgmt., LLC*, 2007 WL 1367698, at *3. The

12  Government argues that the relationship between the Weathers and Precision is so closely

13  intertwined that Precision holds title to 605 Academy as Tom's nominee or alter ego.

14  Precision has failed to establish an absence of disputed material facts, specifically that it

15  does not hold title to 605 Academy as Tom's nominee or alter ego, and the Court denies

16  its motion as to this issue.

17  **C.    Fraudulent Transfer**

18       In the alternative, Precision moves for summary judgment as to the Government's

19  argument that Tom's assignment of the 605 Academy purchase agreement to Precision

20  was fraudulent under Washington law. At the time of the alleged assignment, Washington

21

22

1   had adopted the Uniform Fraudulent Transfer Act.[3] Under the Uniform Fraudulent

2   Transfer Act, a transfer is fraudulent as to a creditor if the debtor made the transfer:

3       (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
        or
4       (2) Without receiving a reasonably equivalent value in exchange for the
        transfer or obligation, and the debtor:
5               (i) Was engaged or was about to engage in a business or a
                transaction for which the remaining assets of the debtor were
6               unreasonably small in relation to the business or transaction; or
                (ii) Intended to incur, or believed or reasonably should have believed
7               that he or she would incur, debts beyond his or her ability to pay as
                they became due.

8   RCW 19.40.041(a) (2010). In analyzing whether a transfer was made with actual intent to

9   hinder, delay, or defraud, the statute provides eleven factors to consider, including

10  whether "[t]he debtor was insolvent or became insolvent shortly after the transfer was

11  made or the obligation was incurred." *Id.* at (b)(9); *see also id.* at (b)(1)–(11).

12          Precision argues that it is entitled to summary judgment on this issue because 605

13  Academy was not an "asset" of Tom Weathers and there was no transfer of the asset to

14  Precision. The Uniform Fraudulent Transfer Act does not treat encumbered property as

15  an asset. RCW 19.40.022(2)(i) (2010). Precision argues that Tom never held any equity

16  or value in 605 Academy and that 605 Academy was fully encumbered. The Government

17  contests this argument, claiming that Tom held an interest in the property when he signed

18  the original sale agreement. Additionally, it argues that the prior encumbrances on 605

19

20  _____

21      [3] RCW Chapter 57 was amended in July 2017 and renamed the "Uniform Voidable Transfers Act." The amendments do not apply to any transfers made, obligation incurred, or right of action that has accrued before July 23, 2017. RCW 19.40.905. Thus, the Court will apply the Uniform Fraudulent Transfer Act.

22

1   Academy were cleared as part of the sale. But even if the prior encumbrances were

2   relevant to Tom's transfer, the Government asserts that the nature of the encumbrances is

3   a contested issue of material fact. The Court agrees with the Government that there are

4   material issues of fact as to whether 605 Academy was an asset of Tom Weathers.

5       Moreover, Precision argues that the Government can only prevail on its fraudulent

6   transfer claim by proving that Tom did not receive reasonably equivalent value in

7   exchange for his interest in 605 Academy. However, Precision fails to address the first

8   way a transfer may be fraudulent under Washington law—when the transfer is made with

9   actual intent to hinder, delay, or defraud any creditor. Even if the Government cannot

10  establish that there was a failure to receive reasonably equivalent value, Washington law

11  allows the Government to succeed on this theory if it can prove that Tom fraudulently

12  transferred 605 Academy to Precision with the intent to hinder his creditors. Precision has

13  failed to establish an absence of disputed material facts. Thus, the Court denies

14  Precision's motion for summary judgment as to this issue.

15                        **IV.  ORDER**

16      Therefore, it is hereby **ORDERED** that Precision's motion for partial summary

17  judgment, Dkt. 114, is **DENIED**.

18      Dated this 2nd day of September, 2020.

19

20

21      BENJAMIN H. SETTLE
        United States District Judge

22