UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>THOMAS WEATHERS, et al.,<br><br>    Defendants. | CASE NO. C18-5189 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff the United States' motion for summary judgment. Dkt. 137. The Court has considered the briefs filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I.   FACTUAL BACKGROUND

**A.   Overview**

In 1996, Defendants Thomas and Kathy Weathers created two entities, T&K, a limited partnership, and TKW, a limited partnership, purportedly for estate planning purposes. They then transferred at least eight properties to T&K and TKW. In 2005, the Weathers were convicted of tax evasion for conduct beginning in the mid-1990s. The

1  convictions were based in part upon these transfers. The Weathers owe the IRS

2  approximately $4 million.

3        The United States seeks to reduce the Weathers' tax liabilities for 1998 through

4  2011 and T&K and TKW's tax liabilities for certain years from 1998 through 2011 to

5  judgment. These liabilities give the United States liens against the Weathers' property

6  and, it alleges, T&K and TKW's properties and rights to property. The United States

7  contends that the Weathers still control T&K and TKW as their nominees or alter egos,

8  so the properties are subject to the tax liens against the Weathers. Alternatively, the

9  United States contends that the properties are subject to the liens because the Weathers

10  fraudulently transferred them to T&K and TKW. In addition to seeking to foreclose

11  federal tax liens on the eight domestic properties, the United States seeks an order

12  directing the Weathers to liquidate their interest in a condominium in Belize.

13        The Weathers' children, Brian, Bradley, Katie, and Kayla,[1] have ownership

14  interests in the domestic properties through T&K and TKW, which they hold through an

15  entity called BKKB, Inc. BKKB owns Precision Property Management ("PPM"), which

16  manages properties for T&K and TKW. T&K and TKW assert that the Weathers'

17  children's ownership interests are legitimate and that the United States cannot seize their

18  property to pay for their parents' misdeeds.

19

20

21

22      [1] The Court refers to Thomas and Kathy Weathers as "the Weathers" and refers to their
adult children by name or as "the Weathers' children."

**B.      The Domestic Properties**

There are eight domestic properties at issue; seven purportedly owned by T&K (one property encompassing approximately 30 duplexes and cabins, a separate duplex, a former hotel converted into housing units and adjacent plot of undeveloped land, a multiunit building, and two unspecified properties) and one purportedly owned by TKW (a five-acre undeveloped lot). Dkt. 138-1 at 85, 88, 89, 90, 93; Dkt. 138-3 at 10, 34–38, 53.[2] Seven of the properties are located in Longview, Washington, and one is located in neighboring Kelso, Washington.

Thomas Weathers declares, without supporting detail, that he and Kathy purchased the properties "for nothing or very little down and assumed the existing encumbrances," so the properties had no equity at the time of purchase, and in 1996 "due to continued deferred maintenance and minimal principal payments" the debt on the properties was equal or greater to their value." Dkt. 146, ⁋ 2. Brian Weathers declares the lot TKW owns "produces expenses by way of property tax and brush control, but no income." Dkt. 149, ⁋ 3.

---

[2] The properties are:
- Property 1: 1465 Baltimore Ave., Longview, WA 98632
- Property 2: 232-236 26th Ave., Longview, WA 98632
- Property 3: 1306 9th Ave., Longview WA, 98362
- Property 4: Land adjacent to 1306 9th Ave., Longview, WA 98362
- Property 5: 1316 11th Ave., Longview, WA 98362
- Property 6: 2111 42nd Ave, Longview, WA 98362
- Property 7: Land adjacent to 2111 42nd Ave, Longview, WA 98362
- Property 8: 603 Academy St., Kelso, WA 98626

It is undisputed that the Weathers purported to transfer seven of these properties to T&K and one to TKW in 1996 via quitclaim deed. Dkt. 138-2 at 128, 143, 155, 166; Dkt. 138-3 at 4, 18. The quitclaim deeds all state that "[t]he true and actual consideration paid for this conveyance is for the purposes of estate planning and consists of value wholly other than of cash." Dkt. 138-2 at 128, 143, 155, 166; Dkt. 138-3 at 18, 4.

The Weathers later recorded $1.5 million or $2 million in mortgages against each property in favor of either "Southwind Software Development Corp." or "Mountain Peak Management Corp." and then assigned these mortgages to "Financial Assistance."[3] T&K, TKW, PPM, and the Weathers have all stipulated that the mortgages on seven of the eight properties were not valid. Dkt. 138 at 15–16, 17. Thomas Weathers (signing on behalf of Financial Assistance) later prepared and recorded a false satisfaction of mortgage for six of the eight properties. *See* Dkt. 138 at 185; Dkt. 138-1 at 87, 90, 91; 138-2 at 135, 150–51, 162, 173–74; Dkt. 138-3 at 62–63. He did this in order to obtain real loans from Wapiti Ventures to save those properties from tax foreclosure in 2013.

**C.    The Entities and the Weathers' Tax Conduct**

At the same time the Weathers created T&K and TKW in March 1996, they Weathers created irrevocable trusts for each of their four children. Dkt. 149-1 at 3. Thomas Weathers declares that later that year, he and Kathy filed and fully paid their 1995 income taxes. Dkt. 146, ⁋ 3.

---

[3] Nowhere in the record do T&K or TKW identify the nature of Financial Assistance, whether an entity or person.

Each child's trust was given a 1.5% ownership interest in T&K as a limited

partner, and the Weathers each had a 1% interest as general partners. Dkt. 138-1 at 43–

44. The "Thomas D. Weathers and Kathy J. Weathers Family Trust" held the remaining

92%. *Id*.

Thomas Weathers testified that when he formed TKW in 1996, he held a 1% share

as a general partner and assigned 99% to "First Fidelity Trust Ltd., Nevis" as a limited

partner on the advice of his attorney at the time. *Id*. at 7–8, 207. Thomas testified that he

did not recall anything about First Fidelity. *Id*. at 7–8. T&K, TKW, and PPM's

representative, David Tacke, also testified that he was not familiar with First Fidelity. *Id*.

at 79. TKW asserts that it initially had the same ownership structure as T&K—1.5% held

by each of the children's trusts, 92% held by the family trust, and 1% each held by

Thomas and Kathy. *Id*. at 230.

Thomas Weathers declares that on October 15, 1997, he and Kathy timely filed

their 1996 tax return, but did not pay all tax due because he believed their preparer had

made an error. Dkt. 146, ⁋ 4. He declares that "[a]t that time, I had not formed the idea to

object to federal income tax." *Id*. Kathy Weathers makes the same contention in her

declaration. Dkt. 147, ⁋ 4.

In January 1998, the interests in T&K were purportedly revised so that the

Weathers' children's trusts each held a 17.5% interest in T&K for a total of 70%, and

Thomas and Kathy Weathers held the remaining 30%. Dkt. 138-1 at 16; Dkt. 149-1 at 56.

TKW similarly asserts that in 1998, each of the Weathers' children's trusts acquired a

1    17.5% interest in TKW. Dkt. 138-1 at 230. The Weathers retained a 96% stake in T&K's

2    profits and losses through at least 2012. *Id*. at 105–27.

3         In July 1998, Thomas Weathers filed an amended tax return claiming $0 income in

4    1996. Dkt. 146, ℙ 6. He declares that "[a]t that time, I began to consider objecting to

5    federal income tax." *Id*. He contends that in 1996 and 1997, all of his and Kathy's income

6    came from hotel leases in Oregon, while the Washington properties at issue in this case

7    "never had sufficient income to pay their expenses and did not produce any net income."

8    *Id*., ℙ 8. He also asserts that he and Kathy remained solvent "at least through October of

9    1998." *Id*.

10        In 2004, the Weathers were indicted for tax evasion for 1996 and for failure to file

11   returns for 1998 through 2002. Dkt. 138 at 37–44. The tax evasion charge alleged the

12   Weathers "plac[ed] jointly owned personal properties in the name of nominees to conceal

13   defendants' ownership of such properties from the IRS." *Id*. at 38. A jury found them

14   guilty on all counts. *Id*. at 46–58. Thomas was sentenced to five years in prison, and

15   Kathy was sentenced to two years of probation. *Id*.

16        In March 2009, Brian Weathers (the Weathers' oldest child) incorporated PPM.

17   Dkt. 138-2 at 50. PPM manages properties for both T&K and TKW—most of the

18   properties in this litigation. Dkt. 138-1 at 101. Brian Weathers declares that T&K's

19   expenses exceeded the income earned by the properties, and PPM paid some of T&K's

20   expenses each year "just to keep the properties rentable and out of foreclosure." Dkt. 149,

21   ℙ 18.

22

1    In March 2013, Brian Weathers and his siblings formed BKKB, which purchased

2    PPM from Brian and his associate. Dkt. 138-1 at 81, 136, 138; Dkt. 149-1 at 91. Each

3    sibling purportedly transferred their 17.5% of T&K to BKKB, giving it a 70% stake in

4    T&K. Dkt. 138-1 at 81, 136. TKW similarly asserts that BKKB owns 70% of TKW. *Id.*

5    at 230. Brian contends that he and his siblings began to control and manage their property

6    interests at that point because they had all reached the age of majority and gained

7    sufficient experience to manage the property. Dkt. 149, ⁋ 12. The minutes of PPM's 2013

8    annual shareholder's meeting reflect that as the Weathers' children will be assuming

9    management of "the Longview and Kelso properties," they were therefore "offering to

10   buy Precision Property from its shareholders and continue operating the same under a

11   new management agreement." Dkt. 149-1 at 91. Minutes of a subsequent PPM

12   shareholder's meeting note that the T&K properties "are in dire need of repairs,

13   improvements, and general maintenance," but could become profitable if PPM advanced

14   repair funds to T&K. *Id.* at 92. The minutes also note that PPM will seek to arrange "a

15   new lease . . . for the Joyce Hotel – independent of the existing arrangement with Tom

16   Weathers." *Id.*[4]

17   When Thomas Weathers was released from prison, he began working for PPM

18   doing maintenance, and then "computer work, networking, cabling, that kind of stuff,

19   cameras." Dkt. 138 at 10. PPM paid him a salary. *See, e.g.*, *id.*; Dkt. 138-1 at 97. In 2017,

20

21   _____

22   [4] The Joyce Hotel is another property not within Properties 1–8 purportedly managed by
     and generating rental income for PPM.

1  PPM paid him $29,900 in wages, while paying its president David Tacke $10,400 and its

2  secretary Brian Weathers $32,500. Dkt. 138-2 at 99.

3      PPM also paid Thomas a monthly "cosignor," "cosignatory," or "management"

4  fee ranging from $1,000 to $2,600 and made similar payments on at least two occasions

5  to Kathy Weathers. *See, e.g.*, *id.* at 81, 83–85. The monthly payments from PPM to the

6  Weathers totaled approximately $145,100 between January 2014 and April 2019. *Id.* at

7  83–85. Brian Weathers testified that these payments were for "several different things,"

8  including for maintaining a computer program related to security as well as for

9  guaranteeing on behalf of PPM that it would pay the lease at the Joyce Hotel (as Thomas

10  had a relationship with the owner). Dkt. 138-1 at 140. In his declaration, Brian Weathers

11  asserted that the co-signing arrangement gave Thomas a monthly fee "related to a

12  percentage of the rental income" from the hotel lease. Dkt. 149, ⁋ 24. Tacke also declared

13  that Thomas "co-signed or guaranteed PPM's performance," Dkt. 148, ⁋ 12, but testified

14  that PPM made these payments to Thomas to get him to "go away from" the lease, Dkt.

15  151 at 16. Thomas Weathers was also listed on the utility bills for the properties that

16  T&K and TKW purportedly own, addressed to him at his residence care of PPM or

17  "Coral Management, Inc." Dkt. 138-1 at 102.

18      The United States contends that PPM has made payments on Thomas's behalf to a

19  physical rehabilitation clinic in 2014 and to a Portland-based attorney in 2015. Dkt. 138-2

20  at 101, 103. Tacke declares that the physical therapy payment was due to a work injury

21  and was a benefit provided equally to other employees. Dkt. 148, ⁋ 14. He also declares

22  that the payment to the attorney was for an initial consult for PPM related to their

1   concerns about exposure to the Weathers' liens, rather than for services provided to the

2   Weathers. *Id*.

3       The Weathers accessed additional resources that flowed through PPM. In 2017,

4   PPM issued a $6,500 check to Thomas with "Loan Payment" in the memo line; the

5   amount matched the income tax liability on Thomas's 2016 tax return which he had just

6   filed. Dkt. 138-2 at 105, 109. Tacke contends that this was an above-board loan. Dkt.

7   148, ⊮ 16. Further, PPM paid at least $88,000 in rent for the Weathers' residence between

8   October 2014 and March 2018. Dkt. 138 at 34; Dkt. 138-2 at 123–24. Tacke declares that

9   PPM maintained office and storage space at the Weathers' residence and paid a monthly

10  fair rental fee; PPM additionally sometimes paid the Weathers' rent portion as a payment

11  for Thomas's personal services, which Tacke describes as "[a]dmittedly . . . not a good

12  bookkeeping practice" but not "a personal benefit to Thomas or Kathy Weathers." Dkt.

13  148, ⊮⊮ 17–18.

14  **D.    T&K and TKW's Bank Accounts, Tax Returns, and Tax Liabilities**

15      In 2011, T&K opened a business account at Chase Bank, with Thomas and Kathy

16  Weathers as the authorized signers. Dkt. 138-1 at 143. In early 2016, Thomas Weathers

17  attempted to send $1,030 from T&K's bank account for maintenance expenses to an

18  individual in Belize who manages their Belize condominium as a rental. Dkt. 138 at 19–

19  20; Dkt. 138-3 at 68.

20      As recently as January 2018, the statements from this account went to the

21  Weathers' residence. Dkt. 138-1 at 151–52. They remained on the account until

22  December 31, 2018 (approximately nine months after this litigation began). *Id*. at 145–

1   47. They then removed themselves, but simultaneously added Brian Weathers and re-

2   added Kathy Weathers. *Id*. Brian Weathers declares that he first became aware of this

3   account during litigation as "[t]here was never a need for T&K to have an account

4   because it didn't receive income and had no bills that weren't paid through PPM." Dkt.

5   149, ⸿ 19. He contends that Thomas created the account without his knowledge or

6   authorization, but regardless, no significant funds would be available to the account. *Id*.

7       Thomas Weathers prepared T&K's tax returns for multiple years between 1999

8   and 2011, Dkt. 138-1 at 154–66, and the IRS assessed late-filing penalties, collection

9   fees, and interest against T&K based on the returns, Dkt. 139, ⸿ 37; Dkt. 139-4; Dkt. 138-

10  1 at 168–202. The IRS asserts that T&K owes $31,045.80 as of December 31, 2020. Dkt.

11  139, ⸿⸿ 24, 37; Dkt. 139-5.

12      In 2014, TKW opened a bank account at Chase Bank, with Thomas Weathers as

13  the authorized signer. Dkt. 138-2 at 2. As recently as January 2018, the statements from

14  this account went to the Weathers' residence. *Id*. at 6–7. Thomas remained on the account

15  until December 31, 2018. *Id*. at 4.

16      Thomas Weathers also prepared TKW's tax returns for multiple years between

17  1998 and 2011, Dkt. 138-2 at 9–22, and the IRS assessed late filing penalties, collection

18  fees, and interest against TKW based on these returns, Dkt. 139, ⸿⸿ 25, 38; Dkt. 139-4.

19  The IRS asserts that TKW owes $13,716.21 as of December 31, 2020. Dkt. 139, ⸿⸿ 25,

20  38; Dkt. 139-4.

21

22

## II.   PROCEDURAL HISTORY

On March 12, 2018, the United States filed this action against numerous defendants seeking to reduce federal tax liens against the Weathers, T&K, and TKW to judgment and foreclose the liens as to real property allegedly held by T&K and TKW as nominees and/or alter egos of the Weathers (or following a fraudulent transfer from the Weathers). Dkt. 1. The United States also seeks to require the Weathers to sell real property overseas and to distribute the proceeds from the foreclosures and sales in accordance with the liens and claims of all parties. *Id*.

The Court has granted summary judgment for Defendant Marlene M. Bennett Revocable Living Trust on its claim that it has priority in interest in Property 6 over the Government's liens. Dkt. 131 at 5. The Court has denied summary judgment for Defendant PPM, finding disputes of material fact precluded a determination that it is not a nominee or alter ego of the Weathers or recipient of property fraudulently transferred from the Weathers. Dkt. 132.

On December 9, 2020, the United States moved for summary judgment. Dkt. 137.[5] On January 21, 2021, Defendant Wapiti Ventures responded, asserting that it did not oppose the motion but requesting that any order granting summary judgment specifically state that it holds a lien superior to the United States' lien in Properties 1, 2, 3, 4, 5, and 8. Dkt. 143 at 2.[6] The United States renoted its motion, Dkt. 141, and on January 22, 2021,

---

[5] The United States also moved for leave to file over-length motions and briefs. Dkt. 136. The motion is unopposed and is **GRANTED**.

[6] The United States does not dispute Wapiti Ventures' claim of a superior lien in the identified properties. Wapiti Ventures also asserts that any sale order "should be clear that the

1   T&K and TKW responded. Dkt. 145. The Weathers submitted declarations in support of

2   the response, Dkts. 146, 147, but did not join the response or submit a response on their

3   own behalf. On January 29, 2021, the United States replied. Dkt. 150.

### III.   DISCUSSION

5        The United States moves for summary judgment on the validity of the tax

6   assessments against the Weathers and against T&K and TKW and the related liens

7   against the properties.

**A.      Summary Judgment Standard**

9        Summary judgment is proper only if the pleadings, the discovery and disclosure

10  materials on file, and any affidavits show that there is no genuine issue as to any material

11  fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

12  The moving party is entitled to judgment as a matter of law when the nonmoving party

13  fails to make a sufficient showing on an essential element of a claim in the case on which

14  the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

15  (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

16  could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

17  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

18  present specific, significant probative evidence, not simply "some metaphysical doubt").

19  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

20  supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

21  _____

    buyer will be buying subject to Wapiti Venture's existing and superior lien against the subject
22  property" or otherwise account for its priority in interest. Dkt. 143 at 2.

1    versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

2    *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

3           The determination of the existence of a material fact is often a close question. The

4    Court must consider the substantive evidentiary burden that the nonmoving party must

5    meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

6    U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

7    issues of controversy in favor of the nonmoving party only when the facts specifically

8    attested by that party contradict facts specifically attested by the moving party. The

9    nonmoving party may not merely state that it will discredit the moving party's evidence

10   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

11   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

12   nonspecific statements in affidavits are not sufficient, and missing facts will not be

13   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

14   **B.     Tax Assessments Standard**

15          "In an action to collect tax, the government bears the burden of proof. The

16   government can usually carry its initial burden, however, merely by introducing its

17   assessment of tax due." *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983)

18   The assessment is presumptively correct if supported by a "minimal evidentiary

19   foundation." *Id.* (citing *Weimerskirch v. Comm'r*, 596 F.2d 358, 360 (9th Cir. 1979)). The

20   taxpayer then has the burden to rebut the presumption by a preponderance of the

21   evidence. *Rapp v. Comm'r*, 774 F.2d 932, 935 (9th Cir. 1985). "[W]hen a taxpayer has

22   overcome the presumption by competent and relevant evidence, the presumption

1    disappears and drops out of the case. Thus, the burden of proving the deficiency reverts

2    to the government." *Keogh v. Comm'r*, 713 F.2d 496, 501 (9th Cir. 1983). Additionally,

3    with respect to penalties assessed for underpayment due to negligence or intentional

4    disregard of the rules and regulations, the IRS's determination "is presumptively correct

5    and must stand unless the taxpayer can establish that he was not negligent." *Hall v.

6    Comm'r*, 729 F.2d 632, 635 (9th Cir. 1984) (citing IRC § 6653(a); *Alexrod v. Comm'r*, 56

7    T.C. 248, 258 (1971)).

8        **1.    Thomas and Kathy Weathers**

9        The United States has met its burden in this case as to the Weathers' tax liabilities.

10   It has introduced undisputed evidence that the IRS made federal tax assessments for

11   Thomas and Kathy Weathers for 1998 through 2002, Dkt. 138 at 59–165, and that the

12   United States Tax Court determined that the Weathers owed these taxes and related

13   penalties, *id.* at 166–70. It has introduced undisputed evidence that Thomas consented to

14   the IRS's assessments against him for 2003 through 2006, *id.* at 171–73, and that the IRS

15   made assessments against Kathy for 2003 through 2006, Dkt. 139, ¶¶ 21, 35; Dkt. 139-2.

16   It has also introduced undisputed evidence that the Weathers consented to the IRS's

17   assessments against them for 2007 through 2009, *see, e.g.*, Dkt. 138 at 250–51, that the

18   IRS made assessments against the Weathers for 2010 which are not fully paid, *see, e.g.*,

19   Dkt. 139, ¶¶ 22, 36, and that the IRS made assessments against the Weathers for 2011

20   which remain unpaid, *see, e.g.*, *id*. Finally, it has introduced undisputed evidence that as

21   of December 31, 2020, Thomas Weathers' individual liability for 1998 through 2006

22   totals $1,963,720.16, Dkt. 139, ¶ 34; Dkt. 139-1, Kathy Weathers' individual liability for

1998 through 2006 totals $1,650,259.85, Dkt. 139, ¶ 35; Dkt. 139-2, and the Weathers'

join liability for 2007-2011 totals $415,560.40, Dkt. 139 ¶¶ 20-22 & 34-36; Dkt. 139-1;

Dkt. 139-2; Dkt. 139-3.

Despite being represented by counsel in this case and submitting declarations in

support of T&K and TKW's opposition to summary judgment, the Weathers did not

oppose the motion or otherwise attempt to meet their burden to rebut the presumption that

they are liable for the assessments. *Rapp*, 774 F.2d at 935. They further do not dispute

that these assessments remain unpaid. Therefore, the United States' motion to reduce to

judgment the assessments against Thomas Weathers and against Kathy Weathers is

**GRANTED**.

###    2.    T&K and TKW

T&K and TKW do not dispute the amount of the assessment alleged against them.

Instead, they contend they have already paid the assessment in full and the IRS wrongly

applied the payment to the Weathers' individual liabilities rather than T&K and TKW's

liabilities. Dkt. 145 at 2. The United States counters that as T&K made a tax payment as a

condition of obtaining a subordination agreement from the IRS so it could use a loan to

pay property taxes, the loan was an involuntary payment, which the IRS could apply as it

saw fit. Dkt. 150 at 12 (citing *Tull v. United States*, 69 F.3d 394, 397 (9th Cir. 1995)).

"An involuntary payment is 'one made pursuant to judicial action or some form of

administrative seizure, like a levy.'" *Tull*, 69 F.3d at 397 (quoting *In re Technical*

*Knockout Graphics, Inc.*, 833 F.2d 797, 799 (9th Cir. 1987) (internal quotations

omitted)). The United States contends that as it requires payment towards a tax liability

1    as a condition of a subordination certificate under 26 U.S.C. § 6323(d)(1), such payments

2    are involuntary. Dkt. 150 at 13.

3         The parties agree that on January 10, 2013, T&K made a payment to the IRS of

4    $40,906.85. It also appears undisputed that the payment toward a tax liability was a

5    condition of the subordination certificate T&K sought. *See* Dkt. 150 at 13 (contending

6    that the payment reflected the amount of net proceeds available from the loan rather than

7    the amount T&K and TKW's liabilities but conceding that the IRS issued the certificate

8    after receiving the payment) (citing Dkt. 152, ⁋⁋ 8, 11)). They also agree that the IRS

9    applied this payment to Kathy Weathers' tax liabilities.

10        The United States' authorities do not establish that such a condition is legally

11   equivalent to a judicial action or administrative seizure. Other authority suggests it is not.

12   The Seventh Circuit explained:

13       A starting point for ascertaining whether the payments were voluntary is
         the Tax Court's frequently cited definition of involuntary payments in
14       *Amos v. Commissioner*, 47 T.C. 65, 69 (1966): "An involuntary payment of
         Federal taxes means any payment received by agents of the United States as
15       a result of distraint or levy from a legal proceeding in which the
         Government is seeking to collect its delinquent taxes or file a claim
16       therefor."

17   *Muntwyler v. United States*, 703 F.2d 1030, 1032 (7th Cir. 1983). There, the United

18   States contended that the claim it submitted to the assignee was sufficient administrative

19   action to make the payment involuntary, but the Seventh Circuit disagreed. *Id*. at 1032–

20   33. It reasoned that

21       The distinction between a voluntary and involuntary payment in *Amos* and
         all the other cases is not made on the basis of the presence of administrative
22       action alone, but rather the presence of court action or administrative action

resulting in an actual *seizure* of property or money as in a levy. No authorities support the position that a payment is involuntary whenever an agency takes even the slightest action to collect taxes, such as filing a claim or, as appears to be a logical extension of the Government's position, telephoning or writing the taxpayer to inform him of taxes due.

*Id*. at 1033 (emphasis in original). No court action or administrative seizure was involved

in the issuance of the subordination certificate. Therefore, a dispute of material fact

remains whether T&K and TKW are still liable for the assessments alleged against them,

and the United States' motion to reduce these assessments to judgement is **DENIED**.

## C.   T&K and TKW as Nominees or Alter-Egos of the Weathers

The IRS has broad powers to impose federal tax liens under 26 U.S.C. § 6321,

which provides that a lien may be imposed "upon all property and rights to property"

belonging to a taxpayer who has failed to pay taxes owed after assessment and demand.

*Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013). Section 6321

applies to all property of a taxpayer, including property that is held by a third party as the

taxpayer's nominee or alter ego. *Id*.; *see also G.M. Leasing Corp. v. United States*, 429

U.S. 338, 350–51 (1977). The United States contends T&K and TKW are the Weathers'

nominees or alter egos, so the liens which arose against the Weathers' property as a result

of the assessments against them attach to the eight properties held by T&K and TKW. It

argues it has the right to foreclose the liens against the properties to satisfy the Weathers'

tax liabilities. Dkt. 137 at 20–21.

State law controls in determining whether an entity is a nominee or alter ego of the

taxpayer. *United States v. Nat'l Bank of Commerce*, 472 U.S. 723, 722 (1985).

Washington state courts recognize the alter ego doctrine. *See Rapid Settlements, Ltd. v.*

1    *Symetra Life Ins. Co.*, 166 Wn. App. 683, 692 (2012); *Standard Fire Ins. Co. v.*

2    *Blakeslee*, 54 Wn. App. 1, 5 (1989). And federal courts in Washington recognize both

3    nominee and alter ego doctrines. *See Sharp Mgmt. LLC v. United States*, No. C07-402-

4    JLR, 2007 WL 1367698, at *3 & n.3 (W.D. Wash. 2007) (indicating that no Washington

5    state court has addressed nominee liability but finding that the theory still applies in

6    Washington as the alter ego doctrine is a "close kin of the nominee theory"); *accord*

7    *United States v. Smith*, No. C11-5101 RJB, 2012 WL 1977964, at *5 (W.D. Wash. 2012);

8    *United States v. Black*, 725 F. Supp. 2d 1279, 1291–92 (E.D. Wash. 2010), *aff'd* 482 Fed.

9    Appx. 241 (9th Cir. 2012).

10        To determine whether one party holds property as the nominee of another, federal

11   courts in Washington apply the Ninth Circuit's six-factor test: (1) whether the nominee

12   paid no consideration or inadequate consideration; (2) whether the property was placed in

13   the name of the nominee in anticipation of a suit or occurrence of liabilities; (3) whether

14   there is a close relationship between the transferor and the nominee; (4) whether the

15   parties failed to record the conveyance; (5) whether the transferor retained possession;

16   and (6) whether the transferor continues enjoyment of the benefits of the property. *Towe*

17   *Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993).

18        Under the Washington alter ego doctrine, a corporate entity is disregarded when

19   the corporation has been intentionally used to violate or evade a duty owed to another.

20   *Black*, 725 F. Supp. 2d at 1290 (citing *Morgan v. Burks*, 93 Wn.2d 580, 585 (1980)). An

21   alter ego is found where one person "so dominates and controls a corporation" that "a

22   court is justified in piercing the veil of corporate entity and holding that the corporation

1   and private person are one and the same." *Rapid Settlements, Ltd.*, 166 Wn. App. at 692

2   (internal citation omitted). It does not appear that Washington state courts have addressed

3   the alter ego theory in terms of tax and tax liens. One federal court applying the

4   Washington state alter ego theory to a federal tax case held that the doctrine applies

5   where the party was using an artificial legal entity to insulate themselves from their tax

6   liabilities. *Black*, 725 F. Supp. 2d at 1279. In cases where state law is not clear as to the

7   applicability of the alter ego doctrine to tax law, courts in the Ninth Circuit have applied

8   the *Towe Antique Ford Foundation* nominee factors. *See, e.g.*, *911 Mgmt.*, *LLC v. United*

9   *States*, 957 F. Supp. 2d 1186, 1194 (D. Or. 2009).

10          As a threshold matter, the United States contends in its motion for summary

11   judgment that no documentary evidence existed to support the ownership transfers, but it

12   argued that regardless of ownership structure the Weathers have controlled both T&K

13   and TKW and enjoyed the benefits of and exercised control over the properties over the

14   years. Dkt. 137 at 23. In response, T&K and TKW cited documents describing transfers

15   among the children's trusts, T&K and TKW, and BKKB, which they had not previously

16   disclosed. Dkt. 145 at 21–22. The United States moved for sanctions but contended that

17   these late-disclosed documents did not impact its ability to prevail on summary judgment.

18   Dkt. 155 at 2. Thus, the Court directs its analysis to the other factors. No single factor is

19   dispositive to determine nominee or alter ego status and not every factor is required.

20   *Fourth Inv. LP*, 720 F.3d at 1070.

21

22

1              **1.    Consideration for the Transfers**

2           First, TKW and T&K contend that the transfers occurred for the purposes of estate

3    planning. They argue that estate planning is a legitimate reason to transfer the properties,

4    requires no additional consideration, and assert, apparently relying on Thomas Weathers'

5    declaration, that there is substantial evidence the property had a net value of $0 both at

6    the time of the 1996 transfer from the Weathers to T&K and TKW and from T&K and

7    TKW to the children's trusts and at the time of the 1998 transfer of additional interest in

8    T&K and TKW to the children's trusts. Dkt. 145 at 19. Thomas Weathers declares that

9    the equity in the properties held by T&K and TKW between March 1996 and January

10   1998 was at or near zero. Dkt. 146, ⁋ 7. This declaration is not supported by any factual

11   detail in the record.

12          The United States counters that the Weathers' declarations asserting that the

13   transfers were for the purposes of estate planning and a mention of an estate planning

14   purpose in T&K's partnership agreement do not constitute evidence of "actual estate

15   planning or that any professional recommended this particular course." Dkt. 150 at 5. It

16   contends that an estate planning purpose is inconsistent with the false mortgages and the

17   initial assignment of 99% of TKW to First Fidelity. *Id*. It contends that the "love and

18   affection" intangibles that support consideration for the purposes of estate planning are

19   not consideration for the purposes of this first factor of the nominee analysis. *Id*. at 6

20   (citing *United States v. Johnson*, No. 3:14-cv-05190, 2015 WL 1467049, at *7 (W.D.

21   Wash. Mar. 30, 2015)). It cites evidence that the Weathers assumed real mortgages on

22   only three of the eight properties and argues that each property had value through the

rental income generated even in the event that equity across the properties as a group was low or nonexistent. *Id*. at 7 (citing Dkt. 138-2 at 125–26, 136–41, 152–53, 163–64; Dkt. 138-3 at 8, 33–38, 53).

Viewed in the light most favorable to T&K and TKW, the evidence on the lack of consideration factor is neutral at best. While the Weathers' declarations of their estate planning intent are some evidence in their favor, there is no evidence in the record of the particular tax benefit for this strategy the Weathers identified on their own and, as the United States points out, no evidence that they consulted an estate planning professional.

Furthermore, the United States argues persuasively that encumbering the properties with millions of dollars of false mortgages and assigning 99% of TKW to an entity other than the Weathers' children are actions substantially more consistent with shielding assets rather than estate planning. Moreover, that an estate planning transfer would ostensibly proceed without consideration does not mean the Court must ignore the lack of consideration in assessing a nominee relationship.

### 2.   The Weathers Transferred the Properties in Anticipation of Liabilities to Entities They and Their Children Owned and Controlled

Next, the United States argues that the Weathers made the property transfers to shield them from their anticipated liabilities, starting the process in 1996, "the year for which they were found guilty of tax evasion and shortly before the four-year period (1998–2002) for which they were found guilty of failure to file tax returns." Dkt. 137 at 22. T&K and TKW counter that the Weathers had no IRS obligations in March of 1996 as they had fully paid their 1995 taxes. Dkt. 145 at 20.

1    As noted, the Weathers declare that when they filed their 1996 return, on October

2    15, 1997, they did not pay all the tax due because Thomas believed their tax preparer had

3    made an error but still intended to pay the correct tax. Dkt. 146, ⁋ 4; Dkt. 147, ⁋ 4.

4    Thomas contends that at that time he had not formed the intent to object to federal

5    income tax, something he began doing in 1998. Dkt. 146, ⁋ 4. These declarations are

6    conclusory, self-serving, and could not be credited by a rational trier of fact. *See Lujan*,

7    497 U.S. at 888–89; *Matsushita*, 475 U.S. at 586.

8    It is entirely implausible that the Weathers transferred substantial assets to T&K

9    and TKW in March 1996, underpaid their taxes in October 1997 by simple coincidence,

10   substantially increased their children's ownership interests in those substantial assets in

11   January of 1998, and then again by fortunate coincidence, began to consider objecting to

12   federal income tax in June 1998. As the United States points out, the Weathers'

13   indictment for tax evasion in 1996, on which they were convicted, alleged that they

14   placed property in the names of nominees to conceal their ownership from the IRS. Dkt.

15   150 (citing Dkt. 138 at 38). Therefore, the transfer in anticipation of liabilities factor

16   weighs strongly in favor of the United States.

17   The close relationship factor similarly weighs strongly in favor of the United

18   States. T&K and TKW apparently had no purpose and conducted no business other than

19   holding assets. The Weathers assigned the majority ownership stake to their minor

20   children shortly after creating each entity. The children retain that ownership through

21   BKKB and assigned management to PPM, run by Brian Weathers and his associates. *See*

22   *Fourth Inv. LP*, 720 F.3d at 1071 (that the entities were wholly owned and controlled by

the transferor parents or their children at the time of the initial transfer and subsequent

assessments weighs in favor of a nominee relationship on the third factor).

### 3.     The Weathers Controlled the Properties and Benefitted from Their Income

Finally, the fifth factor, continued possession, and the sixth factor, continued

enjoyment of the benefits of the transferred property, strongly favor the Government,

particularly in the context of "the overarching consideration, [which] is 'whether the

taxpayer exercised active or substantial control over the property.'" *Id*. at 1070 (quoting

*In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999)). The United States is correct that the

Weathers continued to control the properties and receive their income after purportedly

transferring them to T&K and TKW. Dkt. 137 at 24.

While the Weathers did not physically possess each property, they remained

substantially intertwined in the properties' affairs. The United States contends that facts

including Thomas Weathers' preparation of tax returns for T&K and TKW for the years

at issue, his creation of bank accounts for each entity, and his creation and resolution the

false mortgages show his unfettered control over T&K and TKW's finances. Dkt. 137 at

23–24. T&K and TKW counter that accountants do not control the entities for which they

prepare taxes, and similarly, the utility bills Thomas received and paid are simply

evidence that he acted as a bookkeeper for PPM. Dkt. 145 at 23. Brian Weathers declares

that Thomas's responsibilities as bookkeeper were ministerial, not management-level,

and did not include the authority to take personal benefits. Dkt. 149, ¶ 20. T&K and

TKW also argue that the false mortgages had no legal effect, and "the sum total of

1    improper activity within [the bank] accounts seems to be a failed attempt to wire $1,030

2    to Belize." Dkt. 145 at 24.

3          Even viewed in the light most favorable to T&K and TKW, the Court concludes

4    that the control the Weathers exercised over the properties weighs strongly in favor of the

5    conclusion that the entities were the Weathers' nominees. Thomas manipulated of

6    millions of dollars in false mortgages against the properties, and the claimed owners, his

7    children, took no action when they discovered his actions. This is compelling evidence

8    that Thomas continued to control and enjoy the assets. Moreover, even if the bank

9    accounts conducted little business, re-adding Kathy Weathers to at least T&K's account

10   upon discovery of the secret bank accounts, Dkt. 138–1 at 145–47, is entirely inconsistent

11   with T&K and TKW's contention that they did not authorize or approve of these actions.

12         In support of the sixth factor, the United States argues the Weathers' 96% stake in

13   T&K's profits would have given them most of T&K's rental income before PPM took

14   over and provides undisputed evidence that substantial funds continued to flow through

15   PPM to the Weathers after PPM began collecting the rent. Dkt. 137 at 24. It asserts that

16   PPM "earns income almost entirely from the rent [Properties 1–8] generate." *Id*.

17   Specifically, the United States contends that the benefits the Weathers received from

18   T&K through PPM include Thomas Weathers' salary from PPM and the monthly

19   cosignor/cosignatory payments, PPM's payment of the Weathers' rent, and the 2016

20   "loan." *Id*. at 25.

21         T&K and TKW do not deny that substantial funds flowed from PPM, which

22   managed all their property, to the Weathers. They contend these funds were for legitimate

1   business services and appear to argue that the funds the Weathers received were from

2   sources other than Properties 1–8. T&K and TKW argue that T&K generated only losses,

3   citing T&K's 2012 and 2013 Schedule K-1 forms. Dkt. 145 at 8–9, 14. They cite Brian

4   Weathers' declaration contending that the only property TKW owns is a bare lot which

5   produces expenses but no income and contending that the monthly payments Thomas

6   received were a percentage of the rental income from the Joyce Hotel lease he guaranteed

7   (which appears to have been held directly by PPM rather than through T&K and TKW).

8   *Id*. at 11 (citing Dkt. 149, ¶ 3, 24). They also argue that the Weathers legitimately acted

9   as general partners of T&K and TKW until their children were old enough to take over

10  and cite Brian Weathers' declaration that T&K's income never exceeded its expenses and

11  that it was being subsidized by PPM. *Id*. at 22 (citing Dkt. 149, ¶ 18).

12       They further contend that each payment to the Weathers financially advantaged

13  PPM. Brian Weathers declares that paying Thomas a salary as PPM's bookkeeper was a

14  financial advantage to PPM because Thomas was familiar with the property, property

15  management, and bookkeeping, and would do the work for less than a non-family

16  member. Dkt. 149, ¶ 14. He and Tacke declare that PPM paid a portion of Thomas and

17  Kathy's rent because PPM saved money by using the home for storage and office space.

18  Dkt. 145, ¶ 15; Dkt. 148, ¶¶ 17–18. Similarly, Brian declares that paying Thomas "as a

19  subcontractor to operate and maintain PPM's internet and security systems throughout all

20  of the properties" was a financial benefit to PPM. Dkt. 145, ¶ 16. Tacke contends that the

21  loan was a bona fide loan. Dkt. 148, ¶ 17. Finally, Brian and Tacke both contend that the

22  monthly fee PPM paid Thomas was in return for Thomas's guarantee to a hotel owner

that Thomas would guarantee PPM's performance on a lease of the hotel, at a financial

benefit to PPM, and represented a portion of income from the lease Dkt. 145, ⸗ 24; Dkt.

148, ⸗ 12. However, these assertions are contradicted by Tacke's deposition testimony

that PPM paid Thomas to "go away from" the lease. Dkt. 151 at 16.

Even if the Court were to credit all of T&K and TKW's explanations for the

various funds that flowed to Thomas, their contention that the properties generate a tax

loss and their hotel lease rationale for the monthly payments,[7] the fact remains that PPM

collected the rental income at least from the properties owned by T&K. PPM then

regularly allocated substantial funds to the Weathers, apparently well in excess of those

allocated to PPM's own management (considering at least the rental payments and

salary). These allocations allowed the Weathers to continue enjoying the benefits of the

property.

T&K and TKW provide no specific evidence refuting the United States'

contention that more funds flowed through PPM to the Weathers than flowed to any other

individual at PPM. Without some significant, probative evidence to support Brian

Weathers' contention in declaration that the source of PPM's available funds was other

than from the T&K properties, or otherwise explaining how PPM paid Thomas Weathers'

salary and the Weathers' rent entirely independent of the rental income from the T&K

---

[7] In reply, the United States contends that the hotel lease could not be the source of the monthly payments, at least after 2016, because the hotel at issue closed in 2016. Dkt. 150 at 9. However, the United States does not cite, and the Court is not aware of, evidence in the record to support this contention.

properties, a rational trier of fact could not conclude that the Weathers had ceded control of and ceased benefitting from the properties.

### 4.     T&K and TKW are the Weathers' Nominees or Alter Egos

Therefore, at least four of the nominee factors weigh strongly in favor of the United States, and two are neutral. In the totality of the circumstances, even resolving all factual disputes in the light most favorable to the Weathers, no reasonable factfinder could conclude other than that T&K and TKW are the Weathers' nominees.

The Court reaches the same conclusion under the alter ego analysis. Thomas's domination and control of T&K and TKW's assets through the false mortgages, the bank accounts and utility bills, and the receipt of substantial funds is clear in the record for the reasons discussed and justifies piercing the corporate veil as to both T&K and TKW. *Rapid Settlements, Ltd.*, 166 Wn. App. at 692. Therefore, the United States' motion for summary judgment that to the extent T&K holds title to properties 1-6 and 8, it does so as the Weathers nominee or alter ego, and that to the extent TKW hold title to Property 7, it does so as the Weathers nominee or alter ego, is **GRANTED**. And because the assessments against the Weathers are valid, the United States may thus foreclose its liens and sell Properties 1–8 to satisfy the Weathers' liabilities. *See* 26 U.S.C. § 7403.

### D.     The Weathers Fraudulently Transferred the Properties to T&K and TKW

The United States contends that the Weathers' transfers of Properties 1 through 8 to T&K and TKW were fraudulent under Washington law and should be set aside. At the time of the allegedly fraudulent transfers, Washington had adopted the Uniform

1    Fraudulent Transfer Act.[8] Under the UFTA, a transfer is fraudulent as to a creditor if the

2    debtor made the transfer:

3        (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
         or
4        (2) Without receiving a reasonably equivalent value in exchange for the
         transfer or obligation, and the debtor:
5                (i) Was engaged or was about to engage in a business or a
                 transaction for which the remaining assets of the debtor were
6                unreasonably small in relation to the business or transaction; or
                 (ii) Intended to incur, or believed or reasonably should have believed
7                that he or she would incur, debts beyond his or her ability to pay as
                 they became due.

8    RCW 19.40.041(a) (2010). In analyzing whether a transfer was made with actual intent to

9    hinder, delay, or defraud, the statute provides eleven factors to consider, including

10   whether "the transfer was of substantially all of the debtor's assets" and whether "[t]he

11   debtor was insolvent or became insolvent shortly after the transfer was made or the

12   obligation was incurred." *Id.* at (b)(3), (b)(9); *see also id.* at (b)(1)–(11). "The United

13   States can show actual intent to defraud when a taxpayer stops filing tax returns, creates a

14   trust that is under the control of the taxpayer, transfers property into the trust, and retains

15   full control and possession of the property after the transfer." *Smith*, 2012 WL 1977964,

16   at *6 (citing *United States v. Black*, 725 F. Supp. 2d 1279, 1291–92 (E.D. Wash. 2010)).

17       Under the first test—intent to hinder, delay, or defraud a creditor—T&K and

18   TKW contend that the transfers took place before the Weathers anticipated substantial tax

19

20   _____

21       [8] RCW Chapter 57 was amended in July 2017 and renamed the "Uniform Voidable
     Transfers Act." The amendments do not apply to any transfers made, obligations incurred, or
     rights of action which accrued before July 23, 2017. RCW 19.40.905. Thus, the Court will apply
22   the Uniform Fraudulent Transfer Act.

1  liabilities and at a time when they were solvent. Dkt. 145 at 28 (citing Dkt. 146, ¶ 7). The

2  United States counters that because the Weathers did not pay all of their tax liability

3  when they filed their 1996 tax return, they were presumed insolvent under RCW

4  19.40.021(2) and became insolvent as the result of the transfer, showing their intent to

5  defraud, RCW 19.40.041(1)(a). Dkt. 150 at 12. RCW 19.40.021(2) provides that

> [a] debtor that is generally not paying the debtor's debts as they become
> due other than as a result of a bona fide dispute is presumed to be insolvent.
> The presumption imposes on the party against which the presumption is
> directed the burden of proving that the nonexistence of insolvency is more
> probable than its existence.

9  The United States emphasizes that within a year of the transfers, the Weathers

10  filed their 1996 tax return and did not pay all the tax due—and thus were not paying their

11  debts as they came due. Dkt. 150. at 12. The Weathers' contention that they made this

12  decision as a result of a dispute with their tax preparer, rather than to shield assets from

13  the massive tax liabilities they would shortly incur, is a contention that no reasonable

14  factfinder could credit. *Matsushita*, 475 U.S. at 586; *Anderson*, 477 U.S. at 253. As the

15  Court concluded regarding the anticipation of liabilities factor, it is entirely implausible

16  that the Weathers' transfer of Properties 1 through 8 interspersed neatly with their dispute

17  with the tax preparer but before they had any intent to incur huge tax liabilities. Instead,

18  the fact pattern is closely aligned with the pattern described in *Smith*—the Weathers

19  created trusts under their control, transferred property, stopped filing tax returns, and

20  retained control and benefit from the property after the transfer. 2012 WL 1977964, at *6.

21  Therefore, the Weathers are presumed insolvent as a result of the transfers.

22

The evidence T&K and TKW cite in support of their contention that the Weathers were solvent is not the sort of specific, significant probative evidence required to avoid summary judgment. *Matsushita*, 475 U.S. at 586. Specifically, Thomas Weathers declares that the Weathers' income in 1996 and 1997 came from hotel leases in Oregon rather than from the Washington properties and that he and Kathy remained solvent through October 1998. Dkt. 146, ⁋ 8. Again, this is a conclusory, nonspecific statement that does not meet the burden to rebut the presumption of insolvency that arose as a result of failure to pay tax liabilities. *Lujan*, 497 U.S. at 888–89; RCW 19.40.021(2). Therefore, the Court concludes that the transfers are fraudulent under RCW 19.40.041 and void under RCW 19.40.071.

**E.     The Belize Property**

Thomas and Kathy Weathers did not reply to the United States' motion or contest its assertion that it is entitled to judgment directing them to liquidate any foreign assets including their Belize property, and repatriate the resulting proceeds to the United States to satisfy their outstanding tax liabilities. Dkt. 137 at 31; Dkt. 150 at 2 n.2. The Court agrees with the United States' contention that such an order is appropriate under the district court's authority in 26 U.S.C. § 7402(a) to issue orders "necessary or appropriate for enforcement of the internal revenue laws," and cites instances where district courts have ordered repatriation of funds to pay outstanding tax liabilities. *See* Dkt. 137 at 28 (citing, among others, *United States v. Grant*, No. 00–8986–CIV, 2013 WL 1729380, at *1 (S.D. Fla. Apr. 22, 2013) (granting permanent injunction after defendant failed to comply with repatriation order); *United States v. Greene*, No. C–83–6107–MHP, 1984

1  WL 256, at *1 (N.D. Cal. Mar. 30, 1984) ("Repatriation is appropriate where the record

2  shows a substantial tax liability exists and the government's ability to collect the tax

3  might otherwise be jeopardized.")). In light of the Weathers prior criminal conviction for

4  tax evasion and their extensive outstanding liabilities, an order to sell the property and

5  apply the proceeds to the outstanding liabilities is justified.

6  **IV.  ORDER**

7  　　　Therefore, it is hereby **ORDERED** that the United States' motion for summary

8  judgment, Dkt. 137, is **GRANTED in part and DENIED in part** as set forth herein. The

9  United States' motion for leave to file over-length motions and briefs, Dkt. 136, is

10  **GRANTED**.

11  　　　The Court enters judgment as follows:

12  　　　1.  Judgment in favor of the United States and against Thomas Weathers for

13  　　　　　unpaid federal tax assessments against him for 1998 through 2006 in the

14  　　　　　amount of $1,963,720.16,77, as of December 31, 2020, plus interest and

15  　　　　　other statutory additions, pursuant to 28 U.S.C. § 1961(c)(1) and 26 U.S.C.

16  　　　　　§§ 6621 and 6622, that continue to accrue;

17  　　　2.  Judgment in favor of the United States and against Kathy Weathers for

18  　　　　　unpaid federal tax assessments against her for 1998 through 2006 in the

19  　　　　　amount of $1,650,259.85, as of December 31, 2020, plus interest and other

20  　　　　　statutory additions, pursuant to 28 U.S.C. § 1961(c)(1) and 26 U.S.C.

21  　　　　　§§ 6621 and 6622, that continue to accrue;

22

1      3.  Judgment in favor of the United States and against Thomas and Kathy

2           Weathers for unpaid federal tax assessments against them for 2007-2011 in

3           the amount of $415,569.40, as of December 31, 2020, plus interest and

4           other statutory additions, pursuant to 28 U.S.C. § 1961(c)(1) and 26 U.S.C.

5           §§ 6621 and 6622, that continue to accrue;

6      4.  Judgment that, by virtue of these unpaid tax assessments, the United States

7           has valid and subsisting federal tax liens on all property and rights to

8           property belonging to Thomas Weathers and Kathy Weathers, whether real

9           or personal, wherever located, and whether presently held or acquired in the

10          future, including Properties 1–8 and the Belize property, as identified in the

11          motion and the Complaint;

12     5.  Judgment that to the extent T&K holds title to Properties 1–6 and 8, it does

13          so as Thomas and Kathy Weathers' nominee or alter ego, and that the

14          United States' tax liens attach to Properties 1–6 and 8;

15     6.  Judgment that to the extent TKW holds title to Property 7, it does so as

16          Thomas and Kathy Weathers' nominee or alter ego, and that the United

17          States' tax liens attach to Property 7;

18     7.  Judgment that to the extent Thomas and Kathy Weathers transferred

19          Properties 1–6 and 8 to T&K and Property 7 to TKW, such transfers

20          constitute fraudulent transfers as against the United States, pursuant to

21          RCW 19.40.041, and are void under RCW 19.40.071;

22

8. Judgment foreclosing the United States' tax liens against Properties 1–8, subject to Wapiti Ventures' superior lien in Properties 1, 2, 3, 4, 5, and 8, and the Marlene M. Bennett Revocable Living Trust's priority in interest in Property 6 (following the United States' submission of a proposed Order of Sale, the Court will enter an Order directing the sale of Properties 1–8 to satisfy, in part, Thomas Weathers' and Kathy Weathers' outstanding federal tax liabilities, subject to any other defendant's rights in any of properties 1–8); and

9. Judgment directing Thomas and Kathy Weathers to liquidate any foreign assets, including their Belize property, and repatriate the resulting proceeds to the United States to satisfy their outstanding tax liabilities.

Dated this 31st day of March, 2021.

BENJAMIN H. SETTLE
United States District Judge