1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

THOMAS WEATHERS, et al.,

                    Defendants.

CASE NO. 3:18-cv-5189-BHS

FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
DECISION

        THIS MATTER came before the Court on a bench trial on the United States of

America's ("the Government") remaining claim against Thomas[1] and Kathy Weathers

("Weathers") and Precision Property Management Corporation ("Precision").

## I.   INTRODUCTION

        The Government brought this action against the Weathers and Precision claiming:

(1) that the Weathers fraudulently transferred property located at 605 Academy Street,

Kelso, Washington, ("the 605 Academy Property") to Precision; (2) that Precision is the

Weathers' alter ego; and (3) that Precision is the Weathers' nominee. The Weathers

_____

        [1] This Decision will use the Weathers' first names for clarity where required.

1   denied these claims. Precision asserted a counterclaim for reimbursement for

2   improvements it made to the 605 Academy Property, and to other properties owned by

3   entities that have been determined by this Court in earlier proceedings to be owned by the

4   Weathers, and not by those entities, because the entities were the alter egos and nominees

5   of the Weathers and, therefore, subject to federal income tax liens. A two-day trial to the

6   Court was held on the claims and counterclaim on November 2–3, 2020. The Court finds

7   for Defendants on Plaintiff's claims and for Plaintiff on Defendants' counterclaim.

8          It is apparent that the Weathers received considerable benefits from their

9   relationship with Precision and undoubtedly had substantial influence over those who

10  owned, managed, and directed Precision's operations. Even so, these benefits, which

11  were generally reasonable payments for the rental use of portions of the Weathers'

12  residence and services performed for Precision by Thomas, and the Weathers' influence

13  did not amount to the control and possession required to rise to a level that rendered

14  Precision as Weathers' alter ego or nominee. Further, the transfer of the 605 Academy

15  Property was not fraudulent. Neither Thomas nor Kathy had any interest *of value* in that

16  property when Thomas assigned to Precision his purchaser's interest in a Real Estate

17  Purchase and Sale Agreement involving the 605 Academy Property.

18         Precision's Sixth Counterclaim seeks "*reimbursement* for the taxes and other

19  expenditures paid for the preservation, maintenance and improvement of the properties."

20  Dkt. 33 at 18 (emphasis added). Precision also contends that it is entitled to a superior,

21

22

equitable lien[2] on the other Properties it manages for T&K Limited Partnership ("T&K") and TKW Limited Partnership ("TKW"), to the extent its efforts preserved those properties from condemnation, property tax liens and potential foreclosure on such liens, and from foreclosure by the lenders. Dkt. 205 at 9. Precision primarily relies upon *Sumpter v. United States*, 302 F. Supp. 2d 707 (E.D. Mich. 2004). The Government correctly points out that *Sumpter* only permitted reimbursement for property tax payments, which is not what Precision seeks here, and further that *Sumpter* appears to be an outlier, inconsistent with Ninth Circuit law on the subject. *See* Dkt. 215 at 10 n.4 (citing *United States v. Christensen*, 269 F.2d 624, 629 (9th Cir. 1959) (mortgagee's payment of state taxes on mortgaged property after federal tax liens were recorded did not give mortgagee a lien for such local taxes superior to the United States' tax liens)).

Precision also conditionally claimed reimbursement for similar expenses paid for the benefit of the 605 Academy Property, if the Court were to conclude that the Weathers own that property. Because the Court finds for Precision on this issue, this counterclaim is DISMISSED as moot.

## II.   DICUSSSION

The Government commenced this civil action to reduce tax assessments to judgment and to foreclose federal tax liens in March 2018. It sought to recover taxes owed by the Weathers, and alleged that three entities owned or controlled by the Weathers were their nominees or alter egos, and that certain properties owned by the

---

[2] Precision's post-trial brief argues that its claims for reimbursement, restitution, or unjust enrichment are essentially the same claim in the context of this case. Dkt. 212 at 22.

1  Weathers were transferred fraudulently, for the purpose of avoiding the Government's tax

2  liens. The entities are T&K, TKW, and Precision.

3      The Government alleged that these entities between them owned nine properties

4  for the benefit of the Weathers. *See generally* Dkt. 1. The government sought and

5  obtained summary judgment as to the nature of eight of these properties (called

6  "Properties 1–8" throughout this case), and the Court's Order Granting in part and

7  denying in part the Government's Motion for Summary Judgment, Dkt. 159, details the

8  factual and procedural history of the Government's claims regarding those properties.

9      That Motion and that Order did not address Precision's interest in the ninth

10 property, the 605 Academy Property. The Government's claims and Precision's defenses

11 and counterclaims regarding the 605 Academy Property were the subject of the

12 November 2021 bench trial.

13     The Government correctly argues that in the context of federal tax liens, the

14 nominee and alter ego doctrines are analyzed similarly. Dkt. 213 at 16 (citing *United*

15 *States v. Smith*, No. C11-5101, 2012 WL 1977964, at *6 (W.D. Wash. June 1, 2012)

16 ("The factors to be considered in determining whether an entity is an alter-ego of a

17 taxpayer are similar to the nominee factors.")); *see also United States v. Black*, 725 F.

18 Supp. 2d 1279, 1289–90 (E.D. Wash. 2010) (applying nominee and alter ego doctrines);

19 *Sharp Mgmt. LLC v. United States*, No. C07-402-JLR, 2007 WL 1367698, at *3 & n.3

20 (W.D. Wash. May 8, 2007) ("[T]he alter ego doctrine [is] a close kin of the nominee

21 theory . . . .").

22

ORDER - 4

Courts in this District have considered the following factors in making this determination:

> 1. the nominee paid no or inadequate consideration for the property at issue;
> 2. the property was placed in the name of the nominee in anticipation of litigation or liabilities;
> 3. a close relationship exists between the transferor and the nominee;
> 4. the parties to the transfer failed to record the conveyance;
> 5. the transferor retained possession; and
> 6. the transferor continued to enjoy the benefits of the transferred property.

*Smith*, 2012 WL 1977964, at *5 (citing *Black*, 725 F. Supp. 2d at 1291–92; *Sharp Mgmt.*, 2007 WL 1367698, at *3). Precision argues that the Government is obligated to prove its case by clear and convincing evidence, but the Government accurately cites to authority holding that both nominee and alter ego claims are subject to the preponderance of evidence standard. Dkt. 215 at 6 (citing *Sequoia Prop. & Equip. Ltd v. United States*, No. 97-cv-5044-LJO, 2002 WL 31409620, at *12 (E.D. Cal. Sept. 19, 2002) ("The Government has the burden to prove by a preponderance of the evidence its nominee/alter ego claims.").

The government is obligated to prove its Uniform Fraudulent Transfer Act claim by "clear and satisfactory" evidence. Dkt. 213 at 23 (citing *United States v. Allahyari*, 980 F.3d 684, 692 (9th Cir. 2020)). The elements of that claim are:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

1          (ii) Intended to incur, or believed or reasonably should have believed

2  that he or she would incur, debts beyond his or her ability to pay as they
   became due.

3  Dkt. 213 at 23 (citing RCW 19.40.041(1)).

4         In addition to the foregoing, the Court makes the following findings of fact and

5  conclusions of law.

6  ### III.   FINDINGS OF FACT

7         1.      Beginning in 1990, Thomas and Kathy bought several properties in

8  Longview, Washington. These properties are described as "Properties 1–8" in the United

9  States' Complaint.

10         2.      In March 1996, Thomas formed T&K and TKW.

11         3.      At first, Thomas and Kathy each held 1% of T&K's shares. The Thomas D.

12  Weathers and Kathy J. Weathers Family Trust held 92%. The remaining shares were

13  equally split among trusts set up in the names of each of the Weathers' children.

14         4.      TKW had a different structure. Thomas held 1% of TKW as a general

15  partner and "First Fidelity Trust Ltd., Nevis" held 99% of TKW as a limited partner.

16         5.      From March 1996 through July 1996, Thomas purported to transfer his and

17  Kathy's interests in Properties 1–6 and 8 to T&K. In its prior Order on Summary

18  Judgment, the Court held that T&K is the Weathers' nominee and alter ego. In addition, it

19  held that the transfers of Properties 1–6 and 8 to T&K were fraudulent under Washington

20  law. These findings are law of the case. Dkt. 159 at 32.

21         6.      In May 1996, Thomas purported to transfer his and Kathy's interests in

22  Property 7 to TKW. The Court has held that TKW is Weathers' nominee and alter ego. In

addition, it held that the transfer of Property 7 to TKW was fraudulent under Washington law. These findings are also law of the case.

7.    In September 2004, Thomas and Kathy went to trial on criminal charges of tax evasion related to the 1996 tax year and failure to file tax returns for 1998–2002. A jury found Thomas and Kathy guilty on all counts. The Court sentenced Thomas to 60 months of incarceration followed by three years of supervised release, and Kathy to two years of probation.

8.    In September 2009, the U.S. District Court, District of Oregon, held that 911 Management LLC was Thomas Weathers' nominee or alter ego. This Court takes judicial notice of this fact. Because of that decision, 911 Management dissolved in 2010.

9.    On March 16, 2009, Precision was incorporated in Nevada. Precision was formed to take over management of the Portland hotels and Properties 1–8 from 911 Management, which had been virtually owned and controlled by the Weathers.

10.    On March 20, 2009, Precision held one of its first shareholder meetings. The shareholders consisted of Brian Weathers (Thomas and Kathy's eldest son), Rockwell Naron, and Daniel Dent. The minutes note that the three "founded the company, and paid capital contributions."

11.    Naron did not pay a capital contribution. Dent does not recall whether he did so.

12.    On January 8, 2011, Naron resigned from Precision shortly after Brian had confronted Naron with allegations that Naron had been stealing from the company and bringing drugs and prostitutes into the properties.

13.     According to its filing with the Nevada Secretary of State (as of June 29, 2020), Precision's current officers and directors consist of David Tacke (President) Brian (Secretary); and Thomas and Kathy's younger son, Bradley Weathers (Treasurer).

14.     After Naron resigned from Precision, Tacke became involved with the company. In March 2013, Tacke became Precision's chief operating officer.

15.     As an incentive for Tacke to join Precision, Precision offered him an option to acquire a 25% stake in the company and ownership of Property 7. Tacke did not exercise that option.

16.     In 2013, Brian and his three siblings formed BKKB, Inc. to hold their real property interests in T&K and TKW, properties which were managed by Precision.

17.     BKKB purchased Precision in April of 2013. At that time, Dent resigned his positions with Precision.

18.     Thomas and Kathy were not involved in the formation of BKKB. They never had an ownership or management interest, or any type of involvement in BKKB.

19.     Neither Brian, Naron, nor Dent ever held an ownership interest in or had management authority for 911 Management. Brian worked for 911 Management as an entry level desk clerk.

20.     Precision did not assume 911 Management's leases with property owners. It prepared and executed its own leases.

21.     Precision prepared and executed its own property management agreements with property owners.

22.     Precision did not assume 911 Management's rental contracts with tenants. It prepared and executed its own rental contracts.

23.     Precision's offices were not the same as 911 Management's offices and Precision's telephone number was different from 911 Management's telephone number.

24.     Precision never collected any rents or other funds that should have been paid to 911 Management and never paid any of 911 Management's bills.

25.     Precision managed the properties owned by T&K and TKW subject to property management agreements.

26.     Kathy never worked for Precision in any capacity.

27.     Thomas worked at Precision as a bookkeeper, primarily managing accounts payable. Tacke negotiated the reasonable salary with Thomas after investigating the cost to engage a bookkeeper. Thomas worked approximately 30 hours per week as Precision's bookkeeper.

28.     Until 2016, Precision managed the Joyce Hotel in Portland, Oregon.

29.     Thomas was not involved with Precision's negotiations of the Joyce Hotel lease and had no authority or control over it.

30.     For a time, Thomas also received monthly payments as a guarantor of Precision's Joyce Hotel lease, an arrangement required by the landlord which provided an economic benefit to Precision. The payments to Thomas had various memo line entries that were at times confusing or poorly stated. When the Joyce Hotel lease ended in 2016, Thomas's guarantor payments ended as well.

31.     Precision eventually sued the owner of the Joyce Hotel and, in 2016, received a net award of approximately $65,000 after payment of attorney fees

32.     Precision put the money it received from the lawsuit into improving the properties it managed for T&K and TKW in Washington.

33.     Thomas was not involved in the Joyce Hotel lawsuit or the decision to use the proceeds to improve Properties 1–8.

34.     At about the same time the lawsuit ended and Precision received its money award, Precision changed its television and internet provider for the rental properties to DirecTV.

35.     After changing to DirecTV, Precision learned that DirecTV would charge an additional $3,500 for a monthly maintenance and service charge. Thomas was adept in that type of work and agreed to provide the same service for $2,000 per month. In addition, Thomas would maintain Precision's security systems and perform electrical repairs. Hiring Thomas as a 1099 subcontractor to provide these services provided a substantial economic benefit to Precision.

36.     When payments from Precision to Thomas changed from cosigner payments to subcontractor payments, no one changed the check memo line notations to acknowledge the changed circumstances. The failure to correct the memo line notation did not change the nature and purpose of the payments.

37.     For several years, Precision rented dedicated office and storage space from Thomas and Kathy at their residence. According to their written agreement, Precision paid the Weathers' landlord directly and the Weathers reimbursed Precision for their

share of the rent each month. The balance was tracked by contemporaneous ledger entries. Renting office and storage space from the Weathers provided a substantial economic benefit to Precision. The rent agreement was negotiated by Tacke who investigated alternatives and determined that the negotiated rent payable to the Weathers was fair and reasonable.

38.    Precision never paid Thomas more than the fair value of the services he provided. Those payments provided a substantial economic benefit to Precision.

39.    Precision loaned $6500.00 to Thomas and Kathy so they could pay income tax. The loan was repaid. Other non-owner Precision employees also borrowed money from Precision.

40.    Thomas was reimbursed for automobile damage occurring while he was performing duties within his scope of employment.

41.    In lieu of filing a workers compensation claim, Thomas was reimbursed for a chiropractic visit for a back injury suffered while performing duties for Precision.

42.    Precision paid the legal fee of attorney Jefferey Wong for legal advice to Precision in connection with exploring the possibility of Precision purchasing Thomas and Kathy's interest in T&K and TKW properties.

43.    Thomas was never listed on any of Precision's bills or invoices and Precision's bills were never sent to his home office, though Thomas was listed on some of T&K's bills, and those bills were sent to his home office.

44.     Thomas was not authorized to deal with Precision's creditors or lenders, and he did not do so other than in a clerical role. Management duties were the responsibility of Brian or Tacke.

45.     For a period of time, Thomas did not have his own checking account. At times he requested that Precision make his checks payable to Kathy so they could more easily be deposited in her account.

46.     Thomas and Kathy did not comingle their personal finances with Precision's, they did not pay Precision's expenses, and Precision did not pay their personal expenses.

47.     Thomas has never had check signing authority for Precision.

48.     Precision used the net rental income from the Joyce Hotel to cover the losses from Properties 1–8. Those funds were used to perform the repairs and maintenance for the properties that did not produce sufficient income.

49.     Thomas was not involved in how to allocate funds or make up the shortfall of Properties 1–8.

50.     Precision often did not have sufficient income to pay its bills. Thomas was never involved in deciding which creditors would be paid on time and which would be paid later. Brian and Tacke had that responsibility.

51.     In 2015, Precision sued the owner of the Joyce Hotel for unfair business practices, eventually receiving a gross settlement award of more than $200,000.

52.      Precision used its net award of $65,000 from the lawsuit to pay for maintenance and repairs for Properties 1–8.

53.     Thomas was not involved in any of the decisions regarding the lawsuit, its settlement, or the use of the money recovered.

54.     As early as August 7, 2010, Precision formally decided to purchase property located at 605 Academy Street in Kelso, Washington.

55.     Thomas was not involved in Precision's decision to purchase the 605 Academy Property.[3] Thomas held the initial purchaser's interest in the real estate purchase and sale agreement but transferred it to Precision. His actions were not based on any agreement with Precision.

56.     Only Precision paid funds for the purchase of the 605 Academy Property.

57.     At the time of its purchase by Precision, the 605 Academy Property was in severe disrepair due to neglect and a major water leak. The interior of the house required a complete renovation. The roof also needed to be replaced. Due to the repairs necessary to make the property habitable, its fair market value was at or below the $80,000 Precision paid for it. That value was $23,000 or more below the county's assessed value, which did not take the recent water damage into account.

58.     As a result of its purchase by Precision, the 605 Academy Property was fully encumbered by a promissory note in the amount of $80,000 and deed of trust in favor of the sellers. The amount of the promissory note equaled or exceeded the fair market value of the property at the time of the sale.

---

[3] The parties' filings have commonly referenced the 605 Academy Property as "Property 9."

59.     Thomas never held a title or possessory interest in the 605 Academy Property.

60.     Precision purchased the 605 Academy Property from its prior owners, paid full fair market value, and has maintained ownership since then. Neither Thomas nor Kathy paid or committed any funds to the purchase of the 605 Academy Property.

61.     The Special Warranty Deed for the 605 Academy Property was properly recorded, naming Precision as its owner.

62.     Precision could not afford to pay contractors to perform the necessary repairs for the 605 Academy Property. Accordingly, Precision's owners and Tacke provided most of the labor and most of the materials and supplies for that work themselves.

63.     Thomas and Kathy did not contribute any money or work toward the purchase or repair of the 605 Academy Property and have never held themselves out as its owners.

64.     Thomas and Kathy have never received a benefit from the 605 Academy Property.

65.     Shortly after buying the 605 Academy Property, Precision fell behind on its payments to the sellers and experienced buyer's remorse. Rather than take the property back, the sellers agreed to add the missed payments back into the remaining principal. Tacke negotiated that settlement. Thomas was not involved in the process.

## IV.   CONCLUSIONS OF LAW AND DECISION

1.      The Government failed to prove its alter ego and nominee claims by a preponderance of the evidence, and failed to prove its fraudulent transfer claim by clear and satisfactory evidence.

2.      The Weathers were never owners of Precision and never served as its board members or officers. The Weathers never had or exercised control over Precision.

3.      The Weathers never received personal benefits from Precision (other than the payments to Thomas for the fair value of services he provided).

4.      The payments from Precision to Thomas were in exchange for services that were a substantial economic benefit to Precision.

5.      Precision is a separate legal entity, owned by BKKB. BKKB was not owned or controlled by Thomas or Kathy.

6.      Precision is not an alter ego or nominee of Thomas or Kathy.

7.      Precision purchased the 605 Academy Property from the Schoonovers as sellers and paid full fair market value for it.

8.      Thomas never held an ownership or possessory interest in the 605 Academy Property and the assignment by him to Precision was an assignment without value.

9.      The 605 Academy Property is owned by Precision, and neither Thomas nor Kathy have ever held or enjoyed an ownership or possessory interest in that property, other than the subsequently transferred, inchoate, and essentially valueless purchaser's interest in the purchase and sale agreement.

10. Precision paid adequate consideration to the Schoonovers for the 605 Academy Property.

11. There is no credible evidence that the purpose of Thomas's transfer of the right to purchase the 605 Academy Property was in anticipation of litigation or liabilities, or with intent to hinder, delay, or defraud a creditor of the Weathers.

12. Neither Thomas nor Kathy had or have any property interest or rights in Precision or the 605 Academy Property.

13. The transfer of interest in the purchase and sale agreement for the purchase of the 605 Academy Property from Thomas to Precision was not fraudulent.

The clerk shall enter a judgment in Defendants' favor on the Plaintiff Government's claims regarding the 605 Academy Property, and in the Government's favor on Precision's counterclaims for reimbursement, and shall close the case.

IT IS SO ORDERED.

Dated this 8th day of February, 2022.

BENJAMIN H. SETTLE
United States District Judge